(Franklin County Court of Common Pleas.)

THE CENTRAL TRUST COMPANY, OF NEW YORK, v. STEVENSON BURKE.

1. Resolutions adopted by the directors and ratified by the stockholders of a railway company authorized the issuance of bonds for a loan of $14,500,000, and the execution of a mortgage on all of the company's property to secure it, and declared that $8,000,000 of the bonds "should be sold and disposed of by the president and executive committee, and the proceeds thereof shall be applied for the purpose of double tracking, equipping and increasing the transportation facilities of, and improving the company's railway, and in purchasing such real estate and other property as in the judgment of the board of directors, or the president and executive committee, the interests of such company require."
In the mortgage executed in obedience to these resolutions to the Central Trust Company by the railway company, the resolutions were recited in full, and a mutual agreement and covenant was made therein for the benefit of all persons who might thereafter become owners and holders of the bonds, by which it was agreed and covenanted that 8,000 bonds and their proceeds should be applied to the uses specified in the resolutions. The combined legal effect of the resolutions and covenant and agreement, in the mortgage, was to impress an express trust upon those bonds and their proceeds in favor of the bondholders, their trust interest being in the application of the bonds or their proceeds to the expressed uses.
2. The directors and executive committeemen are charged with having appropriated and converted the bonds and their proceeds to their own use. That, if true, was a pollution of the trust.
3. Although there was no technical privity or trust relation between the directors and committeemen on the one side, and the Trust Company, or the bondholders, on the other; yet, as the directors and committeemen owned practically all of the stock of the company when the resolutions were passed, the mortgage executed, and the trust abused, those acts were, in equity, the acts of the directors and committeemen, thereby constituting them trustees of the express trust. A petition praying for a pecuniary recovery of the trust money and interest from them as trustees is invulnerable to a general demurrer.
4. An express trust is, until it is *openly* disavowed or repudiated by the trustees, and the disavowal or repudiation is brought home to the *cestui que trustent*, a continuing and subsisting trust, and an action for its desecration is not barred by the statute of limitations.
5. If the directors and committeemen were only constructive trustees, is the action barred by that statute?
6. The relations of creditor and debtor and *cestui que trust* and trustee may, if agreed to, co-exist in the same transaction, between the same parties, there being no "inherent incompatibility" between them.

(Decided January 10, 1895.)

PUGH, J.

The questions for decision in this case arise upon demurrers to the petition of the plaintiff and the amendment to it.

A history of the case, as it is given in the pleadings, does not seem necessary. I shall only mention the relevant master facts, and they are few.

Three railroad corporations were consolidated into one and called The Columbus, Hocking Valley and Toledo Railway Company. The directors were Messrs. Burke, Greene, Charles Hickox, Chas. G. Hickox, Ellis, McKinnie and Chauncey H. Andrews; Greene being also president, and Burke vice-president. Burke, Charles Hickox and McKinnie constituted the executive committee.

In September, 1881, the stockholders authorized the execution of a mortgage or trust deed on all of the company's property, to secure the payment of bonds for $14,500,000, to run for fifty years. The deed was made to the General Trust Company, the plaintiff.

Resolutions were adopted by the stockholders, by which it was determined that $6,500,000 of the bonds should be reserved and issued for the purpose of retiring the same amount of bonds issued by the three railway

companies before the consolidation, and secured by a first mortgage lien, and that $8,000,000 of the bonds, "should be sold and disposed of by the president and executive committee, and the proceeds thereof shall be applied for the purpose of double tracking, equipping and increasing the transportation facilities of, and improving the company's railway, and in purchasing such real estate and other property as in the judgment of the board of directors, or the president and executive committee, the interests of said company require." To be more exact in statement, these resolves were first adopted by the directors and subsequently ratified by the stockholders. These resolutions were recited in the mortgage or trust deed, to induce, as the petition charges, persons to purchase the bonds, and were relied upon by the Trust Company.

In the trust or mortgage deed was a mutual covenant and agreement, made by the railway company and the Trust Company, and expressed to be "*for the benefit and use of all persons who shall become holders and owners of the bonds issued under and secured, or intended to be secured hereby.*"

What is denominated the Fifth Article of the covenant and agreement is, that "eight thousand of the bonds, amounting to eight million dollars, * * * shall be at once executed by the president and secretary of said railway company, and certified by said Central Trust Company, of New York, trustee, and delivered to the president and vice-president, or either of them," of said railway company, "to be used and disposed of by them in accordance with the stipulations hereinbefore contained."

Technically, no stipulations of that character preceded this article; but it was not controverted, both sides agreed that this referred to the resolutions of the stockholders.

The resolutions were tantamount to stipulations, to an agreement; by adoption they were made parts of the covenant and agreement just as effectually as if they had been repeated in it.

In November, 1881, the 8,000 bonds, aggregating $8,000,000, after having been executed by the officers of the railway company and certified by the Trust Company, were delivered to the executive committee, who then executed a written receipt for them.

In the same month, the committee, through Burke, reported to the directors, that $6,411,000 of the bonds had been sold and delivered to Winslow, Lanier & Co., who had paid for them, which action was approved by both directors and stockholders. At the same time, in obedience to a direction of the directors, the remaining 1589 bonds were delivered to the executive committee, for which the receipt mentioned was executed.

Pursuant to a plan conceived in dishonesty of purpose, and born in bad faith, as the petition alleges, all of the proceeds of these 8,000 bonds were appropriated to their own individual use by the members of the executive committee and the others who are designated as associates, namely, Messrs. Greene, Charles G. Hickox, Ellis, Chauncey H. Andrews, and Wallace C. Andrews.

In the language of forensic satire, this was styled "commercial embezzlement."

Not the least fractional part of the $8,000,000 was applied to all or either of the five purposes enumerated in the resolves of the stockholders and the fifth article of the covenant and agreement of the mortgage.

Prior to the execution of the mortgage or trust deed Burke and his associates bought all of the stock of the railway company, except seven shares. If they had owned the other seven shares, they would, in both popular and legal speech, have been the owners of the road, of *all* the property of the railway company.

From 1881 to 1887, Burke and his associates managed, run and controlled the railway company.

The plaintiff, the Trust Company, had some knowledge at an earlier day, but not full knowledge, till November, 1890, of the malversation of the $8,000,000 by Burke and associates, and of the disavowal of the trust by them.

The relief prayed for is that they be decreed to return the $8,000,000, and legal interest, to the railway company, and that the company be, in effect, ordered to use it in obedience to the resolves of the stockholders and the covenant and agreement of the mortgage.

There are other facts stated in the petition and amendment. Some were only necessary to make the history of the alleged pollution of the trust by Burke and associates complete; others, a few only, are, perhaps, redundant. I have endeavored to cull out the relevant master facts, divested of their necessary legal form and phraseology.

At the threshhold of the case, the question is: Did the mortgage or trust deed create a trust relation between the railway company and Burke and his associates, or any of them, on the one side, and the bondholders, represented by the Central Trust Company, on the other side? The theory of the plaintiff's case is that, by the terms of the trust deed, and especially by the resolutions copied into it, and by the covenant and agreement which I have quoted, an express trust was impressed upon the $8,000,000 of bonds, and their proceeds, in favor of the bondholders.

In the creation or declaration of a trust, there are five essential elements: (1) The terms must be sufficient, and reasonably certain, to raise a trust; (2) The subject of the trust must be definitely expressed; (3) The beneficiaries of the trust must be reasonably certain; (4) The interests of the beneficiaris must be reasonably certain; and (5) The manner in which the trust is to be carried out must also be reasonably certain. 2 Pom. Eq. Juris., secs. 1009–1010.

It is not essential that a trust should be labeled as a trust to make it such legally; the absence of that term is only a circumstance, and often one of very little value and influence.

There is no stereotyped collection of words for the edification of a trust.

In equity there is no idolatry of words. Rights are the principals, remedies the accessories; the democracy of substance is preferred to the tyranny of form; the thing stated is more important than the statement of the thing.

It is only in the jurisprudence of primitive communities that a superstitious reverence for the bald letter of the law, and a corresponding disregard for its spirit and essence are observable. It is only there that judicial proceedings are governed by set phrases and formulas. " A close adherence to the letter is a mark of unripeness everywhere, and especially so in law." Von. Ihering, cited by Brantley, Cont. 34.

An express trust may be begotten by all of the dispositions of an instrument, even in the absence of definite words to create it; or, as the same conception is expressed, it may be inferred from a construction of all the terms of it. Such trusts do not have to be directly and declared. It is not indispensable to a valid trust that a trustee should be designated; for equity never permits a trust to become defunct for a want of a trustee.

The trust interest, if there was any, which the bondholders were entitled to, under the covenant and agreement in the mortgage, was in the application of the $8,000,000 to the double tracking and equipping of the road, the increase of its transportation facilities, the improvement of the road and the purchase of property. By the resolve of the directors, which was ratified by the stockholders, and made part of the fifth article of the covenant and agreement of the mortgage, the eight million dollars were consecrated to these uses. The manifest purpose of this provision

of the mortgage, was to inspire, to invite, people to buy and invest in the bonds, not only at the first sale, but for all time during which they might be sold.

It was the honey-tongue of the mortgage. It advised those who might purchase them that the bonds would be secured by something more than the ordinary lien on the property as it would be when the mortgage should be executed; that is, by a lien on the property, enhanced in value by the expenditure of the $8,000,000 for its improvement and betterment.

The mortgage expressly declares that the covenant and agreement was made, "for the benefit and use of *all* persons who shall become holders and owners of the bonds." That made the persons now represented by the plaintiff, the Trust Company, beneficiaries of the trust. By a barren logic, but not by the true spirit and rule of construction, the benefit of this covenant and agreement may be limited to the first purchasers of the bonds. The language is explicit, precise and unambiguous, embracing early and late holders of the bonds, and no court has the prerogative to make a new agreement for the parties to the mortgage by construing it to include only the original purchasers of the bonds. It would be an unwarranted construction of the plain meaning of the language.

The subject of the trust is $8,000,000, and it is as definitely expressed as language could make it.

The expenditure of this money for the betterment of the road in the five modes I have named, was the manner in which the trust was to be performed, and it was expressed with reasonable certainty.

By the language of the fifth article of mortgage, including, as it does, the resolve of the stockholders, the railway company divested itself of part of the interest which it would otherwise have had in the bonds and their proceeds; namely, the right and power to use them for *all* of the purposes to which property may be devoted by a railway company unhampered by any restrictions. Such a divestment or renunciation, is all-sufficient to create a trust, "even as against the owner of the personal property devoted to the trust, and even when he continued in possession of it." *Barry* v. *Lambert*, 98 N. Y. 306.

There is another case to illustrate this conception. I quote:

"A person in the legal possession of money or property, acknowledging a trust with the assent of the *cestui que trust*, becomes from that time a trustee, if the acknowledgement be founded upon a valuable consideration. His antecedent relation to the subject, whatever it may have been, no longer controls. 2 Story's Eq. Juris., sec. 972. If before a declaration of trust a party may be a mere debtor, a subsequent agreement, recognizing the fund as already in his hands, and stipulating for its investment on the creditor's account will have the effect of creating a trust. *Day* v. *Roth*, 18 N. Y. 446." *Hamer* v. *Sidway*, 124 N. Y. 538.

The facts were these: A person was indebted to his nephew in a sum of money. He wrote to his nephew recognizing the indebtedness, and telling him that he would keep the money till he was capable of taking care of it, and assuring him that he should surely have it, and that he might consider it on interest. These terms were deemed sufficient to raise a trust. It is a case where the word "trust" was not used.

Other cases have been decided where railroad companies agreed and covenanted to use borrowed money for purposes specified, the courts holding that trusts were erected by the covenants and agreements.

In *Van Weel* v. *Winston*, 115 U. S. 228, the railroad company borrowed a million dollars, agreeing to use it in building a road. The Supreme Court held that the lender had a trust interest in the building of the road and in the application of the money for that purpose.

In *Trevellian* v. *The Mayor of Exeter*, 24 Ch. Rep. 157, a corporation was

authorized to borrow money to finish a canal, which it did, executing a mortgage to secure it. Part of the money, however, was applied to the extinguishment of former mortgages. The decision was that the money was raised under a trust, but not applied for the purposes of a trust; that it was a misapplication of the the trust money, and the corporation had to pay it back to the mortgagees.

In *Kitchen* v. *Bedford,* 13 Wall. 413, the receipt for a "sum" in railroad bonds, to which was superadded a promise to expend said "sum" in the purchase of certain lands, was deemed sufficient to propogate a trust in the securities.

*Kershaw* v. *Snowden,* 36 Ohio St. 181, cannot aid the defendants on this issue. Money was placed in the hands of the defendant's decedent who promised to repay it at his death. That was a mere promise to pay the money; there was no stipulation that it should be invested in any manner for the benefit of the creditors. The only relation which was created between the parties was that of creditor and debtor. It is for this reason distinguishable from the case at bar. I concede that there does not seem to be much distinction between that case and *Hamer* v. *Sidway,* cited before.

The case of *Pennock et al.* v. *Coe,* 23 How. 117, arose in this state. Money was loaned to a railroad company, and by a mortgage executed to secure it, it was covenanted that it should be faithfully applied to the construction and equipment of the road. The court declared that, "if the company, after having received the money upon the bonds, and given the mortgage security, had undertaken to divert the fund from the purpose to which it was devoted, namely, the construction of the road and its equipment * * * a court of equity would have interposed, and enforced a specific performance."

If there had been any merit in the theory that nothing but a covenant had been made by the company, and that the only remedy for its breach sounded in damages, it would not have escaped the vigilance and ability of counsel and the court in that case. It is not credible that such a thing would have happened. They did not see any clairvoyance in the word covenant. Nor did that imaginary "incompatibility" or "difficult perplexity," which would arise between the relations of creditor and debtor and trustee or *cestui que trust,* and which so moved the distinguished arbitrators, seem to have any influence upon the eminent justices of that court. Their conclusion that the remedy was specific performance in equity involved the assumption that the bondholders had a trust interest in the application of loaned money according to the covenant.

Emphasis was placed by counsel for defendants upon the resolution of the court in *Thacher* v. *Hope Cem. Ass'n,* 126 N. Y., 507. The plaintiff's contention in that case for a trust was denied. But counsel either overlooked or ignored the explicit qualification contained in this language used by the court: "*If there had been an agreement to take the plaintiff's money and hold and apply it as expressed in the certificate, or the money of some other person, the relation of a trustee might have been created.*"

Here, in the case at bar, the agreement, the covenant, was that the money borrowed should be faithfully applied to expressed uses. Hence, upon this authority, a trust was created. But it is not necessary to advert to any other cases; a few will subserve the purpose of illustration as well as many cases. I am persuaded that the $8,000,000 were, by the terms of the mortgage, trust money, specifically to be applied to the betterment of, the road in the five ways enumerated therein; that the bondholders whether original or second-hand, have an interest in that trust and its enforcement; and that the diversion of the proceeds of the bonds to other purposes—the individual benefit of Burke and his associates—was a pros-

titution of the trust.   The obvious intention of the agreement in the mort-
gage was to make the railway company a trustee to execute the trust.

I am aware that all trusts are not entitled to the consideration of a
court of equity.   Trusts which are only such in a legal sense and are only
cognizable at law, do not come within the domain of equity.   To give
equity jurisdiction, some part of the trust must remain unexecuted ; some
act must remain to be done which rests in confidence.   But this limitation
does not shut the door of equity against the plaintiff in this case.

It was earnestly urged that the railway company, or rather Burke and
his associates, as owners of the road, had the moral and legal right to use
the money derived from the sale of the bonds as they might choose.   If
they did not own all of the stock, that is not legally true, or at least
technically true, even though no trust could be reared upon the mort-
gage.

The rights and powers of a railroad corporation are not identical with
those of an individual.   They are " vested and restricted."   They are only
such as are conferred by statute.   It can only exercise full dominion and
control over its property consistent with the objects of its creation.   With
respect to an individual's property there is no relation of trust or confi-
dence between him and the persons with whom he does business, and his
right to dispose of it as he chooses, is absolute.   He is dealt with on the
basis of his absolute dominion over his own property.   But the situation
of a corporation, whose property is under the control of its directors or man-
aging agents, is radically different.   By the very law of its being that
property is consecrated to the special objects for which the corporation
was created.   Courts of equity do not hesitate to enjoin such directors or
agents from using the corporate property to subserve ends foreign to the
authorized business.

The public, and especially creditors of the corporation, have the right
to rely upon the fidelity and integrity of the directors and managing
agents, that the corporation will, as Blackstone says, "act up to the end or
design" for which it was created.

More intensely true is this of one who is more than an ordinary lien
creditor of a corporation, of one in whose favor the property of the corpo-
ration is specifically burdened with an express special trust.

It was earnestly argued that the road as it was, and is, and without
the enhancement of its value that would accrue from the expenditure of
the $8,000,000, was adequate security for the bonds, and that was all the
security designed by the parties.   But that is begging one of the very ques-
tions at issue.   The argument is a mere assumption, fed by words.   I read
in the fifth article of the agreement and covenant of the mortgage and the
adopted resolve of the stockholders, a clear purpose to make something
more than a mere covenant for whose breach there would be a remedy
sounding in damages.   How utterly inadequate that would be, if the com-
pany's property should be loaded down with mortgages, old and new ?   The
contention for supremacy between electricity and steam had been com-
menced when the mortgage was executed ; the wisest man could not foresee
what might happen from this contest, in the next fifty years, to affect the
value of this road.   The authority given by the stockholders to incorporate
in the mortgage such agrements and covenants as counsel might advise,
and the agreement and covenant in the mortgage touching the uses to be
made of the $8,000,000, are not to be regarded as a mere play on words.   The
parties to the mortgage did not intend that it should live on worn-out, and
wearing-out rails, decaying station houses, and lean road beds, but that
it should be fed on, and be nourished by, the expenditure of the $8,-
000,000.

It was argued that the co-existence of a loan of money and a trust in the

same transaction is a legal anomaly, a legal impossibility, and the great weight of the opinion of the learned arbitrators, who were pronounced to be great lawyers, an encomium in which I concur, was impressed in support of the contention. It is not a question which group of men, whether the learned arbitrators or the Judges of the Supreme Court of New York in General Term, have the superior ability. What is the intrinsic value of the reasoning of the arbitrators? That is the question. About four pages of the eighty-two pages of their printed opinion were used in discussing the question which is now under consideration, namely, whether the agreement and covenant and resolution created an express trust. I do not mean to even intimate that more should have been devoted to its discussion; it was probably unnecessary.

"Too vague and shadowy" is the supposed trust; there are "inherent incompatibilities" between the relations of trustee and *cestui que trust* and creditor and debtor; the theory of a trust "would involve perplexities so difficult, that we think no court of equity would accept it," said the arbitrators. They evidently quoted the word "shadowy" from an opinion of Judge James, of the English Court—a dissenting opinion. They invoke the observations of Justice Miller, in *Van Weel* v. *Winston*, 115 U. S. 246; but they ignore the fact that the question there was, whether there was a trust on the surplus of the money loaned, after the road was built for which the money was borrowed, and that Justice Miller explicitly stated that the bondholders had a trust interest in the building of the road; and if the issue had been whether this trust could be enforced, the decision would have been in the affirmative, it is believed.

In the opinion of the arbitrators, it is assumed that if only $4,000,000 of the $8,000,000 had been needed to double track the road, improve it, increase its transportation facilities, etc., the rest of it, upon the theory of a trust, would have to be paid back to the lenders of the money. The answer to this is, (1) that such a case was not before the arbitrators, and (2) that the obvious import of the agreement in the mortgage was that when the purposes specified were subserved, by the expenditure of enough of the money, if any was left, it would fall out of the trust, and could be disposed of by the company for any other purpose not repugnant to the objects of the corporation's creation. The Supreme Court of the United States had no trouble in solving the difficulties which the arbitrators propounded, or (respectfully be it said) which they imagined would arise upon the theory of a trust. (See pages 276–277 of the Report, 115 U. S. Rep.)

Whether a loan of money can be made, and by the same contract a trust in the application of the money loaned in favor of the lender can be created, must depend upon the intention of the parties.

There is no law or public policy which prohibits parties from making such an agreement. If the use to which the money was to be applied was one of the inducements, one of the moving considerations, for the lender to loan the money, who had the power to challenge the rights of the parties to make the loaned money a trust fund for the consummation of the uses intended?

Again, it was said: "A man cannot be said to receive money which has been placed in the hands of another, to be applied to certain purposes, even though those purposes are beneficial to him. He has no title to the money, and no dominion or power over it, and if this is true when another is made the trustee, it must be equally true when he is the trustee himself." Why should this confusion of law and equity be essayed? Why should the square and compass of technicality be applied to the discussion and determination of such a grave question? The vice of the statement is that it gratuitously assumes that the transaction could not be both a borrowing of money for specific purposes and the creation of

a trust to secure its application to those purposes by the borrower. In such a case the borrower is both a borrower and a trustee. He has a limited dominion over the money, it is true; but he agreed to it. There is no incompatibility between these two characters in one, except to those who are dazled by the omnipotence of form.

Again, it was asserted that the covenant was "promissory in its nature, and of itself creates nothing but a contract." Concede that to be true —does that exclude the covenant from being also the creator of a trust? Take a familiar type of trusts. A. places $5,000 in B.'s hands for the purpose of having the latter invest it in real estate. B. promises to so invest the money, and he does, but he takes the title in his own name. A. sues B., as his trustee, to compel him to convey the title to him or disgorge the money. Would a court of equity be very patient with a defense interposed by B., that there was no trust because the transaction on his part was "promissory in its nature," and had the elements of "nothing but a contract"? It would only be heeded by courts in lands from which equity had been exiled.

There are two views of the agreement and covenant in the mortgage. One is that it was an overture to persons dealing in railway securities to buy the bonds on the faith that its stipulations would be fulfilled. They gave credit and currency to the bonds, as the United States Supreme Court declared in an analogous case. Doubtless money has been invested in the bonds on the assurance that the $8,000.000 had been used for the benefit of the road.

In a court of conscience, should those who appropriated the money, after having decoyed buyers, by such an overture, to invest their money, be permitted to escape from the discharge of their obligation or from making adequate reparation for its breach, by the pretext that it was only a covenant for which there is a remedy in damages against the railway company?

I am not unmindful that neither the petition nor amendment thereto makes the most definite and explicit charge that the bond holders whom the plaintiff represents, relied upon the overture when they invested their money. But indefiniteness, uncertainty and ambiguity are not considered on demurrer, and the averment in plaintiff's pleadings is sufficient to defeat a demurrer.

It is not necessary, however, to rely upon this answer to that claim. If the gravemen of the action was fraud; if the covenant could be assimilated to a false and fraudulent representation addressed to parties meditating a purchase of the bonds, as one of the counsel for defendants argued, then undoubtedly, the petition should have affirmed that the bond holders relied upon, and were justified in relying upon, those representation, and the absence of such averments would have rendered the pleading obnoxious to the demurrer.

But that is not the cause of action stated by the plaintiff. It asserts that a fund, a sum of money, was dedicated to specified trust purposes; the declaration of the trust embraces the bondholders, for whose benefit the plaintiff sues, as beneficiaries. Burke and his associates, are arraigned as the trustees of that trust, for having defiled and appropriated the trust moneys. What right have these alleged trustees, if they are culpable as charged, to interpose the objection that the holders of the bonds did not rely upon the covenant, when they purchased the bonds? When one sues upon a contract which confers upon him a right to recover a sum of money, he does not have to allege or prove that he relied, and had a right to rely, upon the promise of payment.

The other view is to consider the covenant and agreement as a contract. Thus looking at it, it is the ordinary one, which consists of an of-

fer on the one side and an acceptance on the other side. Suing upon it, the plaintiff is only required to allege the making of the offer, the making of the covenant creating the trust, and the acceptance of it by the payment of the money for the bonds. It is not a suit based upon representations made by one party and acts done by the other, upon his confidence in the representations. There is no cause so prolific of confusion and error in law and equity, as unscientific classification. If it is such a contract, the fallacy that the petition is demurrable because it fails to aver that the bond-holders relied upon the covenant, is manifest. But whether it be such a contract, or a declaration of a trust, it seems that such an allegation would be superfluous.

This brings up the second question, which is one of the most perplexing in the case. It is so perplexing that I have had different opinions upon it during the consideration of the case, and I am not sure that the conclusion reached is a sound one.

I have concluded that there was a trust relation between the railway company and the bondholders, through the trust company, the former being the trustee. But is there now, or was there an trust relation between the bondholders and Burke and associates? The covenant and agreement in the mortgage were executed by the railway company, not by Burke and associates. How can it be concluded that the latter are trustees of an express trust? The plaintiff's counsel have avowed that they stand or fall upon the hypothesis of an express trust. In the discussion, which was able and industrious, counsel for plaintiff said very little upon this question, to aid in its solution. The Supreme Court of New York, in General Term, did not discuss it; it contented itself with demolishing the position of the Special Term; but none of them touched upon this subject. That there was no privity or trust relation between the bondholders and Burke and associates in regard to the use of the $8,000.000; that if the money was misapplied by the latter, they are answerable to the railway company, and not to the bondholders, or the trust company, their representative, because the wrong was done to the railway company, and not to the bondholders, are propositions, which have the support of the commanding authority of the Supreme Court of the United States, as it is announced in *Van Weel* v. *Winston, supra.*

The only categorical contention made by counsel for plaintiff, on this subject, was, that the receipt, which I have mentioned, executed by Burke, Charles Hickox and McKinnie, makes them liable as trustees of an express trust. That is the predicate, the basis, the sole foundation, for the imputed trust. If that is the only ground of liability, then the other associates are not responsible. But the receipt was made to the railway company, and not to the bondholders. It fails to establish a privity or trust relation between the latter and Burke and his associates, according to the same authority.

If the court had no higher functions than those of an umpire to perform, the demurrers should be sustained at this point in favor of all the defendants, except the executive committeemen, or their representatives. The position which the plaintiff has adopted would at least excuse such an indolent disposition of the case.

But I am not convinced that this view should settle the question. There is another doctrine of equity which may help to resolve the difficulty encountered.

Whenever property, in its original state and form, is impressed with a trust, no change of that state or form can divest it of the trust. It will be followed in equity into whosoever's hands it comes. *Bona fide* purchasers for value, without notice, are the only persons who can successfully resist. If the trustee, says Judge STORY, or those who represented him,

converted it, they can acquire no more valid claim in respect to it than they respectively had before the conversion. An abuse of a trust can confer no right upon the party abusing it, or those who claimed in privity with him. (2 Story's Eq. Juris. 1258.)

All persons, who are capable of holding the legal title or beneficial interest, when cast upon them by gift, grant, bequest, descent or operation of law, may take the property subject to a trust, and they will become trustees.

But would they be express or constructive trustees? In *Russell* v. *Water Works*, L. R. 20 Eq., 474, they were pronounced to be constructive trustees. If Burke and his associates were not trustees of an express trust, they were undoubtedly constructive trustees.

There is still another consideration. During the argument it was iterated and re-iterated that Burke and associates were owners of nearly all of the stock of the railway. The petition does partially disclose that to be a fact. I have already said that this was no answer to the contention that there was a trust, or if there was a trust, that it was no defense that they owned all the stock. The borrowed money having been taxed with a trust, it is unimportant who owned the stock of the railway company. It is a fact utterly irrelevant as matter of defense. It does not mitigate the enormity of the alleged wrong of which complaint is made. But it is a relevant and important fact in the case against the alleged culpable trustees.

There are only a few cases in which the relative liabilities of the corporation and its stockholders, when they are thus situated, have been considered. The product of these cases is the establishment of the rule that where a single individual is found holding practically the entire stock, with the exception of merely a nominal amount, equity will, from a business point of view, treat the individual as substantially the corporation. This would also be done when the identity is between the corporation and a few individuals. *Wood* v. *Trust Co.*, 128 U. S. 416. What is done by the corporation, in such cases, is, substantially, done by the stockholders.

This is the twin of another truth. Whatever be the legal nature of a corporation as an artificial, metaphysical being, separate and distinct from the individual members, it is a truth that, for the purpose of protecting rights, the property of all business and trading corporations may be, and often is, treated as the property of the individual corporators.

Courts of equity are thus swift to brush away formal impediments in order to measure out real justice and subordinate remedies to rights.

In the case at bar, therefore, the agreement, the covenant, was really and substantially made by Burke and associates; it was the act of the corporation only in name. This conclusion is reasonable, because equity regards the substance or spirit, and not the letter merely; it looks through form to substance; it looks to the intent rather than to the form.

Logically, this view makes Burke and his associates, or those of them who converted the proceeds of the bonds to their own use, responsible as trustees of an express trust It is my present conviction that this is the true solution of the most difficult problem in this case.

I may add that, inasmuch as this question was not elaborately discussed by counsel, it can be re-argued, either upon final hearing of the case, or upon demurrer to the answer. The court will be open to any further consideration that might be offered upon this subject; because it may turn out, in the end, to be important, and vitally important, whether they are constructive trustees or trustees of an express trust.

The next difficult question in this case to determine is, is this action barred by the statute of limitations? If the trust, as to the use of the money, was a continuing and subsisting trust, the answer should be in the negative; otherwise, in the affirmative.

This question has been presented in several analogous cases before this court; but its decision was never required. It is presented here in two branches. Upon one of them I have had conflicting opinions during the discussion and consideration of the case. That an expressed trust, clearly established, is a continuing and subsisting trust, at least until it is disavowed or repudiated by the trustee, is hardly debatable. There is no limitation statute to foreclose the actions for relief, based on the breach of such trust.

The statute is simply a *fac simile* of the old equity rule; a re-enactment of it. In *Prevost* v. *Gratz*, 6 Wheat. 481, the comprehensive proposition was maintained by the United States Supreme Court, with its characteristic ability, that in equity, length of time is no bar to a trust clearly established; and further, in cases of trust, where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief.

A trustee could never disseize the *cestui que trust* of the trust estate. So long as the former was in possession of the estate, equity regarded it as the latter's possession. While there could be no disseizin of the trust, the exercise of an adverse possession by the trustee for a great length of time might, in equity, bar or extinguish the trust. Again, when the trustee disavowed or repudiated the trust, the equitable bar of time would begin to run; but to have that effect, the disavowal and repudiation had to be open, not secret, and it had to be brought *home* to the knowledge of the *cestui que trust*. That required the latter to act, as upon an asserted adverse title.

The breach of the trust may have been characterized by fraud, but that is only an incident of the breach. Besides, the statute is explicit that the chapter on limitations shall not apply " in the case of a continuing and subsisting trust." But such an action against an express trustee who has repudiated or disavowed the trust, may, according to Judge OKEY, in 35 Ohio St. 317, be barred in equity by lapse of time. The time, however, is not sufficient to bar it, in this case, if Burke and his associates are trustees of an express trust.

If Burke and his associates can only be held as constructive trustees, is the action barred?

A doubt upon this question entertained by a lower court should be condoned, since it has not been definitely settled by the Supreme Court. In *Douglass* v. *Corry*, 46 Ohio St. 349, Judge MINSHALL observed that continuing and subsisting trustees are those "technical trusts which are not recognized at law, but fall within the proper, peculiar and exclusive jurisdiction of a court of equity."

That is comprehensive enough to embrace resulting and constructive trusts, the two sub-divisions of implied trusts. They are included within the definition, because they were never recognized at law.

In *Yearly* v. *Young*, 40 Ohio St. 32, Judge DICKMAN said that continuing and subsisting trusts were those technical, direct and express trusts which are of a nature cognizable solely in equity," but that they did not include "implied and constructive trusts, so-called," such as "deposits or bailments, or trusts analogous to these." Deposits and bailments are only metaphorical trusts. In no scientific classification of trusts are they considered as belonging to technical constructive trusts.

The examples given disclose that veritable constructive trusts—trusts which are cognizable solely in equity—were probably not intended to be embraced in the definition.

Unembarrassed by these apparently conflicting conceptions, I should be disposed to hold that the statute of limitations does not begin to run in

favor of an express trustee until he has done some act which is inconsistent with, or repugnant to, the fiduciary relation which he bears to the *cestui que trust*. On the other hand, a constructive trustee being such because of his wrongful act and adverse claim, is entitled to have the statute run in his favor from the very inception of his misconduct.

If I had concluded that Burke and associates could only be made liable for the breach of a constructive trust, this view of the statute of limitations, would necessitate a dismissal of this suit for the reason that it is barred. But the decision will not be necessary, unless a further consideration of the case should lead me to change the judgment that Burke and his associates were trustees of the express trust.

The conclusion reached on both of the doubtful points are not intended to be irrevokable. There is a *locus pœnœtentia* even for a judge in an equity case like this where the defendant may raise the same question heard on demurrer, by this answer.

This decision of the arbitrators cannot be deemed *res adjudicata*. That decision was rendered in a case between the railway company and the defendants. The railway company did not represent the bondholders; they were not parties to that action, even by representation.

On behalf of the legatees and devisees of M. M. Greene, deceased, it was contended that the action as against them was barred under the application of sections 6113, 6217 and 6218 of the Revised Statutes.

This opinion is already so long that I will not pause to give any reason for the judgment that there is no merit in that claim.

Judge Sanderson filed a masterly brief in this case, and this is not said because it is polite to say it, but because I mean it. Most of his argument, however, is founded on the misconception that the cause of action in the petition was fraud, fraudulent representations, To make Burke and his associates responsible, it is not necessary to find that they were guilty of actual fraud and collusion. It is sufficient if they were found to have had any act or part in the breach of a trust.

The chief question which was decided by the Supreme Court of New York, in General Term, has not been discussed in this opinion. The decision by that court was that the acquiescence of Winslow, Lanier & Company, who were the first purchasers of some of the bonds, in the misapplication of the money, and breach of the trust by Burke and associates, did not defeat the equity of subsequent purchasers of the same bonds from Winslow, Lanier & Co. to have the trust respected and enforced. This question does not arise in this case for want of the necessary fact in the petition.

Demurrer overruled.

*Joseph B. Foraker, of Cincinnati, Henry F. Crawford, of New York, Henry J. Booth* and *Thomas J. Keating, of Columbus,* for plaintiff.

*Stevenson Burke, T. W. Sanderson, Geo. K. Nash* and *Telford P. Linn,* for defendants.